UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DANNY DONOHUE, *as President of the Civil
Service Employees Association, Inc., Local 1000*;
AFSCME, AFL-CIO; and CIVIL SERVICE
EMPLOYEES ASSOCIATION, INC., LOCAL 1000,
AFSCME, AFL-CIO,

                              Plaintiffs,


            -against-                                                    1:10-CV-00543 (LEK/DRH)


DAVID A. PATERSON, *as Governor of the State of
New York*; NEW YORK STATE ASSEMBLY; NEW
YORK STATE SENATE; JONATHAN LIPPMAN,
*as Chief Judge of the New York Unified Court System*;
and the STATE OF NEW YORK,

                              Defendants.
───────────────────────────────────────────


KENNETH BRYNIEN, *as President of the New York
State Public Employees Federation, AFL-CIO*,

                              Plaintiff,


            -against-                                                    1:10-CV-00544 (LEK/DRH)


DAVID A. PATERSON, *as Governor of the State of
New York*; the STATE OF NEW YORK; NEW YORK
STATE GOVERNOR'S OFFICE OF EMPLOYEE
RELATIONS; GARY JOHNSON, *as Executive Director
of th the New York State Governor's Office of Employee
Relations*; NEW YORK STATE DEPARTMENT OF
AUDIT AND CONTROL; and THOMAS P. DiNAPOLI,
*as Comptroller of the State of New York*,

                              Defendants.
───────────────────────────────────────────


PHILLIP H. SMITH, *as President of United University
Professions*; UNITED UNIVERSITY PROFESSIONS;
MARGARET M. STOLEE; WILLIAM M. SIMONS;
BRUCE T. KUBE; ROBERT E. REES; GRETA J.
PETRY; LAURA S. RHOADES; and ELEANOR

RICHARDS,

Plaintiffs,

-against-                                                    1:10-CV-00546 (LEK/DRH)

HONORABLE DAVID A. PATERSON, *as Governor of the State of New York*; GARY JOHNSON, *as Executive Director of the Governor's Office of Employee Relations*; NEW YORK STATE DEPARTMENT OF AUDIT AND CONTROL; THOMAS P. DiNAPOLI, *as Comptroller of the State of New York*; NANCY L. ZIMPHER, *as Chancellor of the State University of New York*; THE STATE UNIVERSITY OF NEW YORK; and THE STATE OF NEW YORK,

Defendants.

---

BARBARA BOWEN, *as President of the Professional Staff Congress/CUNY*; PROFESSIONAL STAFF CONGRESS/CUNY; FRANK KIRKLAND; ROBERT J. CERMELE; ROBERT S. NELSON,

Plaintiffs,

-against-                                                    1:10-CV-00549 (LEK/DRH)

STATE OF NEW YORK, DAVID A. PATERSON, *as Governor of the State of New York*; NEW YORK STATE DEPARTMENT OF AUDIT AND CONTROL; THOMAS P. DiNAPOLI, *as Comptroller of the State of New York*; CITY UNIVERSITY OF NEW YORK; MATTHEW GOLDSTEIN, *as Chancellor of the City University of New York*,

Defendants.

---

LILLIAN ROBERTS, *as Executive Director, DISTRICT COUNCIL 37, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES AFL-CIO*; DENNIS IFILL, *as President of LOCAL 1359 (Rent Regulation Services Unit Employees);*

ESTHER TUCKER, *as President of LOCAL 384;*
JAMES B. CULLEN, *as Administrator of LOCAL*
*2054;* MAF MISBAH UDDIN, *as President of*
*LOCAL 1407*; ROBERT AJAYE, as *President of*
*LOCAL 2627*; BEHROUZ FATHI, *as Acting President*
*of CIVIL SERVICE TECHNICAL GUILD - LOCAL 375;*
ERIC LATSON, *as President of LOCAL 1597*; CHARLES
FARRISON, *as President of LOCAL 1797*; MARK
ROSENTHAL; KYLE SIMMONS, *as President of*
*LOCAL 924*; MANUEL A. ROMAN, JR.; and
CLIFFORD KOPPELMAN, *as President of Local 1070,*

Plaintiffs,

-against-                                          1:10-CV-00569 (LEK/DRH)

DAVID A. PATERSON, *as Governor of the State of*
*New York*; NEW YORK STATE ASSEMBLY; NEW
YORK STATE SENATE; JONATHAN LIPPMAN,
*as Chief Judge of the New York Unified Court System*;
NEW YORK STATE DIVISION OF HOUSING AND
COMMUNITY RENEWAL; THE CITY UNIVERSITY
OF NEW YORK (MATTHEW GOLDSTEIN, *as*
*Chancellor of the City University of New York;* and
the STATE OF NEW YORK,

Defendants.

---

## MEMORANDUM-DECISION AND ORDER[1]

## I.    BACKGROUND

Presently before the Court are five Motions for preliminary injunctions, which seek to enjoin

Governor David A. Paterson, the New York State Assembly, the New York State Senate, and the

---

[1] For printed publication in the Federal Reporter.

3

other named Defendants from submitting, enacting, or implementing emergency appropriation "extender bills," which contain certain provisions that allegedly impair the terms of state contracts. Case Nos. 1:10-CV-00543 (Dkt. No. 9); 1:10-CV-00544 (Dkt. No. 4); 1:10-CV-00546 (Dkt. No. 4); and 1:10-CV-00549 (Dkt No 4); 1:10-CV-00569 (Dkt. No. 2). The Motions are brought in separate but related actions concerning a single, substantially similar factual basis. The Court shall address all five Motions together in the instant Order.

Four of the underlying actions (Case Nos. 1:10-CV-00543; 1:10-CV-00544; 1:10-CV-00546; and 1:10-CV-00549) were filed on May 11, 2010; the fifth action (Case No. 1:10-CV-00569) was filed on May 14, 2010. Each of the filed actions included an emergency Motion for a Temporary Restraining Order ("TRO"). On May 12, 2010, this Court granted the TROs requested in Case Nos. 1:10-CV-00543 (Dkt. No. 13); 1:10-CV-00544 (Dkt. No. 5); 1:10-CV-00546 (Dkt. No. 5); and 1:10-CV-00549 (Dkt. No. 5); the Court subsequently granted the TRO requested in Case No. 1:10-CV-00569 on May 17, 2010. Dkt. No. 7.[2]

In Donohue et al v. Paterson et al, 1:10-CV-00543, Plaintiffs Danny Donohue, as President of the Civil Service Employees Association, Inc., Local 1000; AFSCME, AFL-CIO; and the Civil Service Employees Association, Inc, Local 1000, AFSCME, AFL-CIO ("CSEA") have named as Defendants: David A. Paterson, as Governor of the State of New York; State of New York; the New York State Assembly; the New York State Senate; and Jonathan Lippman, as Chief Judge of the New York Unified Court System. In Brynien v. Paterson et al, 1:10-CV-00544, Plaintiff Kenneth

_____

[2] The TROs, which enjoined the immediate effect of the furlough and wage provisions contained in the challenged legislation, remained valid for 14 days from issuance. FED. R. CIV. P. 65(b)(2). In an Order to Show Cause hearing held on May 26, 2010, the date of expiration for the earliest-granted TROs, the Court made an oral ruling extending their effect pending this Order.

Bryien, as President of the New York State Public Employees Federation, AFL-CIO ("PEF") has named as Defendants: David A. Paterson, as Governor of the State of New York; the State of New York; New York State Governor's Office of Employee Relations; Gary Johnson, as Executive Director of the New York State Governor's Office of Employee Relations; New York State Department of Audit and Control; and Thomas P. DiNapoli, as Comptroller of the State of New York.  In Smith et al v. Paterson et al, 1:10-CV-00546, Plaintiffs Phillip H. Smith, as President of United University Professions; United University Professions; Margaret M. Stolee; William M. Simons; Bruce T. Kube; Robert E. Rees; Greta J. Petry; Laura S. Rhoades; and Eleanor Richards have named as Defendants: David A. Paterson, as Governor of the State of New York; the State of New York; Gary Johnson, as Executive Director of the New York State Governor's Office of Employee Relations; New York State Department of Audit and Control; and Thomas P. DiNapoli, as Comptroller of the State of New York; Nancy L. Zimpher, as Chancellor of the State University of New York; and The State University of New York.  In Bowen et al v. Paterson et al, 1:10-CV-00549, Plaintiffs Barbara Bowen, as President of the Professional Staff Congress/Cuny; the Professional Staff Congress/CUNY; Frank Kirkland; Robert J. Cermele; and Robert S. Nelson have named as Defendants: David A. Paterson, as Governor of the State of New York; the State of New York; Thomas P. DiNapoli, as Comptroller of the State of New York; New York State Department of Audit and Control; City University of New York; and Matthew Goldstein, as Chancellor of the City University of New York.  In Roberts et al v. Paterson et al, 1:10-CV-00569, Plaintiffs Lillian Roberts, as Executive Director of District Council 37, American Federation of State, County, and Municipal Employees AFL-CIO ("DC 37"); Dennis Ifill, as President of Local 1359 (Rent Regulation Services Unit Employees); Esther Tucker, as President of Local 384; James B. Cullen, as

5

Administrator of Local 2054; Mas Misbah Uddin, as President of Local 1407; Robert Ajaye, as

President of Local 2627; Behrouz Fathi, as Acting President of Civil Service Technical Guild -

Local 375; Eric Latson, as President of Local 1597; Charles Farrison, as President of Local 1797;

Mark Rosenthal; Kyle Simmons, as President of Local 924; Manuel A. Roman, Jr.; and Clifford

Koppelman, as President of Local 1070 have named as Defendants: David A. Paterson, as Governor

of the State of New York; New York Assembly; New York Senate; Jonathan Lippman, as Chief

Judge of the New York State Unified Court System; New York State Division of Housing and

Community Renewal; The City University of New York, (Matthew Goldstein, as Chancellor of the

City University of New York); and the State of New York.

While the named Defendants differ in part as to each case due to the different groups of

public employees represented as Plaintiffs in the matters, the object of the preliminary injunction

Motions and the arguments made in support of those Motions are broadly the same.[3]  For purposes

of this Order and specification of the relief granted, the Plaintiffs in all five of the matters shall,

collectively, be referred to as "Plaintiffs."

The State of New York is party to collective bargaining agreements ("CBAs") with a variety

of public employee organizations pursuant to Article 14 of the New York Civil Service Law,

otherwise known as the Taylor Law.  "[T]o promote harmonious and cooperative relationships

between government and its employees and to protect the public by assuring, at all times, the orderly

---

[3] In each case, as discussed below, Plaintiffs object to the furlough provisions of emergency appropriations bills that form the basis of the instant actions.  Certain Plaintiffs similarly object to provisions within those appropriations bills withholding funding for wage increases set forth in collective bargaining agreements made between those Plaintiffs and the State.  The Plaintiffs affected by the wage provisions include members of CSEA, PEF, and DC 37.  Finally, CSEA objects to the State's failure to fund an Employment Benefit Fund as provided for in various collective bargaining agreements.

and uninterrupted operations and functions of government," Article 14 sets forth the rights of

employee organizations, and the procedures governing their relations with the State as an employer.

See N.Y. Civ. Ser. Law § 200.  Accordingly, the State has agreed to contracts, currently in effect,

which establish the terms and conditions of employment for members of those organizations.

Nevertheless, Governor David A. Paterson submitted, and the New York State Legislature passed,

an emergency appropriations bill, which enacted unpaid furloughs, a wage freeze, and a benefits

freeze on certain groups of state employees in contravention of a number of such contracts.  The

legislation, a so-called "extender bill," temporarily funded the continued operation of the State in

the absence of an official budget, and expressly imposed the altered terms "[n]ot withstanding any

other provisions of this section or of any other law, including article fourteen of this chapter, or

collective bargaining agreement or other analogous contract or binding arbitration award . . . ."  See,

e.g., Case No. 1:10-CV-00544 (Dkt. No. 4-7, Ex.G) at 63.  This legislation was the subject of this

Court's prior Orders granting Plaintiffs emergency Motions for a Temporary Restraining Order,

which enjoined the implementation of the above-mentioned furlough and wage provisions.  Case

Nos. 1:10-CV-00543 (Dkt. No. 13); 1:10-CV-00544 (Dkt. No. 5); 1:10-CV-00546 (Dkt. No. 5);

1:10-CV-00549 (Dkt. No. 5); 1:10-CV-00569 (Dkt. No. 7).

   Plaintiffs, by way of the Contract Clause, U.S. Const. art. I, § 10, cl. 1, now seek to prevent

further weekly "extender bills" from imposing the challenged terms prior to resolution of their suits.

For a more extensive understanding of the factual background to the instant cases, see generally,

Case Nos. 1:10-CV-00543, 1:10-CV-00544, 1:10-CV-00546; 1:10-CV-00549 and 1:10-CV-00569.


## II.    STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right," Winter v. Natural Res. Def. Council, Inc., __ U.S. __, __, 129 S. Ct. 365, 376 (2008), and "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Moore v. Consolidated Edison Co. of New York, Inc., 409 F.3d 506, 510-11 (2d Cir. 2005). Generally, the Court will grant a motion for a preliminary injunction only if the party seeking the injunction can show "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." NXIVM Corp. v. Ross Institute, 364 F.3d 471, 476 (2d Cir. 2004); Citigroup Global Markets, Inc. v. VCG Special Opportunities Masterfund Ltd., 598 F.3d 30 (2d Cir. 2010).

Irreparable harm is characterized "as certain and imminent harm for which a monetary award does not adequately compensate." Wisdom Import Sales Co. v. Labatt Brewing Co., 339 F.3d 101, 113-14 (2d Cir. 2003); Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979). To establish irreparable harm, Plaintiffs "must demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005) (quoting Rodriguez v. DeBuono, 175 F.3d 227, 234-35 (2d Cir. 1999)). A movant's failure to meet its burden of establishing irreparable harm is alone sufficient for a court to deny injunctive relief. Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990) ("[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.").

In this Circuit, for a proponent to show a likelihood of success on the merits, that party must

8

make a "clear showing of probable success."  See Dopp v. Franklin Nat'l Bank, 461 F.2d 873, 878

(2d Cir. 1972); Haley v. Pataki, 883 F. Supp. 816, 824 (N.D.N.Y. 1995).  The party does not need to

show that it will ultimately prevail on the merits.  Unicon Management Corp. v. Koppers Co., 366

F.2d 199, 204 (2d Cir. 1966); Haley, 883 F. Supp. at 824.


**III.    DISCUSSION**

    **A.    Irreparable harm in the absence of the injunction**

    Irreparable harm is often presumed where a constitutional injury is at stake.  See, e.g., Elrod

v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal

periods of time, unquestionably constitutes irreparable injury.") (citing New York Times Co. v.

United States, 403 U.S. 713 (1971)); Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984) ("When

an alleged deprivation of a constitutional right is involved, most courts hold that no further showing

of irreparable injury is necessary.") (citing 11 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND

PROCEDURE, § 2948, at 440 (1973)); Deeper Life Christian Fellowship, Inc. v. Bd. of Educ. of City

of New York, 852 F.2d 676, 679 (2d Cir. 1988); Statharos v. New York City Taxi and Limousine

Comm'n, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a

constitutional right, no separate showing of irreparable harm is necessary.") (citing Bery v. City of

New York, 97 F.3d 689, 694 (2d Cir. 1996)); Turley v. Giuliani, 86 F. Supp. 2d 291, 295 (S.D.N.Y.

2000) ("Because the violation of a constitutional right is the irreparable harm asserted here, the two

prongs of the preliminary injunction threshold merge into one: in order to show irreparable injury,

plaintiff must show a likelihood of success on the merits.") (citation omitted).  While merely

asserting a constitutional injury is insufficient to automatically trigger a finding of irreparable harm,

see Public Serv. Co. of New Hampshire v. Town of West Newbury, 835 F.2d 380 (2d Cir. 1987),

where, as here, the constitutional deprivation is convincingly shown and that violation carries non-

compensable damages in addition to monetary damages, a finding of irreparable harm is warranted.

Compare infra to Savage v. Gorski, 850 F.2d 64, 68 (2d Cir. 1988) (finding that preliminary

injunctive relief for alleged First Amendment violations was inappropriate because complained of

injury was clearly reparable and appellees' likelihood of succeed on the merits was dubious).

     The Supreme Court has held that the loss of employment does not, in and of itself, constitute

irreparable injury.  Sampson v. Murray, 415 U.S. 61, 90-91 (1974).  It made this finding in the

context of an individual probationary employee's discharge.  Id.  Yet even in that context, it left

open the possibility "that cases may arise in which the circumstances surrounding an employee's

discharge, together with the resultant effect on the employee, may so far depart from the normal

situation that irreparable injury might be found."  Id. at 92 n.68; see also Holt v. Cont'l Group, Inc.,

708 F.2d 87, 90-91 (2d Cir.1983).  Thus, while preliminary injunctive relief is inappropriate in

typical instances of employee discharge, the Supreme Court expressly "refused to foreclos[e] relief

in the genuinely extraordinary situation."   Sampson, 415 U.S. at 92 n.68.

     Several differences exist between the facts of Sampson and those presented here.  Most

obviously, unlike in Sampson, the challenged action does not involve an individual probationary

employee's discharge, but rather the massive furloughing and wage freeze of tens of thousands of

workers.  Additionally, Defendants admit that the challenged provisions of the extender bill

constitute extraordinary actions, see, e.g., Case No. 1:10-CV-00543, Defs.' Mem. (Dkt. No. 18-10)

at 1, rather than the typical instance of employee discharge addressed in Sampson.  See Haley, 883

F. Supp. at 823 (finding that the Sampson standard is not controlling in a factually similar case to

those presently before the Court).

In a comparable case to those presently before the Court, the Second Circuit found that an

attempt by the State to lag public employees' pay was a breach of the Contract Clause, and

recognized that even a temporary loss of pay can have far reaching and dire consequences.  Assoc.

of Surrogates and Supreme Court Reporters v. State of New York, 940 F.2d 766, 772 (2d Cir. 1991)

("Surrogates I").  Stressing the non-compensable damages that affected workers, acting in reliance

upon the terms of their contract, would face under the lag policy, the Second Circuit wrote:

> Many have undoubtedly committed themselves to personal long-term obligations such as
> mortgages, credit cards, car payments, and the like-obligations which might go unpaid in the
> months that the lag payroll has its immediate impact.  Cf. Sniadach v. Family Finance Corp.
> of Bay View, 395 U.S. 337, 342 n.9 (1969) ("'For a poor man . . . to lose part of his salary
> often means his family will go without the essentials.' ") (quoting statement of Congressman
> Gonzales, 114 Cong. Rec. 1833).

Id.

Other courts have similarly recognized the non-compensable, and hence irreparable, harms

that flow from actions of the kind Plaintiffs challenge.   See, e.g., Univ. of Hawai'i Prof'l Assembly

v. Cayetano, 183 F.3d 1096, 1107 (9th Cir. 1999) (upholding preliminary injunction preventing

implementation of delays in issuing paychecks to university employees); West Indian Co., Ltd. v.

Government of Virgin Islands, 643 F. Supp. 869, 882 (D.V.I. 1986) ("The interference with

[plaintiff's] contractual right in violation of the Contract Clause, standing alone, is sufficient

irreparable harm to support the" issuance of an injunction.) aff'd. 812 F. 2d 134 (3d Cir. 1987).

In Haley, the court found that, absent preliminary injunctive relief, irreparable harm would

flow from then-Governor Pataki's failure to include appropriations covering the salaries of

legislative staff in extender bills similar to those challenged here.  883 F. Supp. 816.  The court

based its finding on the immunity that states and state agents receive under the Eleventh Amendment.  Id. at 824 ("should Governor Pataki choose not to later reimburse the legislative employees for their current work, the employees would have no recourse in federal court due to the Eleventh Amendment bar on suits for retroactive monetary damages against the states.").  The Second Circuit has stated that where a federal remedy to recover pecuniary losses is barred under the Eleventh Amendment, irreparable harm is present.  United States v. State of New York, 708 F.2d 92, 93 (2d Cir. 1983).  Plaintiffs' similar lack of a federal remedy for retroactive damages, therefore, adds an additional basis for the Court's conclusion that Plaintiffs will experience irreparable harm absent a preliminary injunction.

Defendants contend that no irreparable harm will flow from the extender bill given the State's promise that the uncompensated furloughs will not last longer than eight weeks, see, e.g., Case No. 1:10-CV-00543, Megna Aff. (Dkt. No. 18) ¶ 97, and that it will retroactively reimburse the 4% raises once a budget is enacted for 2010-2011, see id. ¶ 86.  See, e.g., Case No. 1:10-CV-00543, Defs.' Mem. (Dkt. No. 18-10) at 30.  As noted above, however, the harm flowing from provisions such as those currently being challenged is not cured by their being limited in duration, see Surrogates I, 940 F.2d at 772, nor by a promise of eventual reimbursement, see Haley, 883 F. Supp. at 824.  Plaintiffs have met their burden of showing that the permanent 20% loss in salary and wages that the furlough plan effects constitutes irreparable harm and that irreparable harm flows from Defendants' failure to pay the contracted-for increases in salaries and wages, which were negotiated years prior to the challenged extender bill, and upon which the affected employees have surely relied.

At this juncture, however, Plaintiffs have failed to show that Defendants' non-appropriation

12

of Employment Benefit Fund ("EBF")[4] contributions will result in irreparable harm in the absence

of an injunction.  Plaintiffs correctly assert that the loss of medical or dental care may constitute

irreparable harm.[5]  See Commc'ns Workers of America, Dist. One, AFL-CIO v. NYNEX Corp., 898

F.2d 887, 891 (2d Cir. 1990); Whelan v. Colgan, 602 F.2d 1060, 1062 (2d Cir. 1979) ("threatened

termination of benefits such as medical coverage for workers and their families obviously raised the

spectre of irreparable injury.").  They have not shown, however, that such harm is imminent absent

injunctive relief.  Plaintiffs contend, that the "Governor's refusal to provide payments to fund the

EBF will result in the exhaustion of the EBF statewide account by or before July 1, 2010."  Case

No. 1:10-CV-00543, Hanna Aff. (Dkt. No. 9-1) ¶ 40; Howard Aff. (Dkt. No. 9-5) ¶ 28.  Given that

the identified harm is months away and the challenged extender bills are issued on a week-to-week

emergency basis and only until the State passes a 2010-2011 budget, the State's failure to fund the

EBF as scheduled is, as of now, insufficiently imminent to warrant preliminary relief.

**B.**     **Plaintiffs Show a Likelihood of Success on the Merits**

Typically, upon a showing of irreparable harm in the absence of preliminary injunctive

relief, a party seeking such relief may prevail either by showing "a likelihood of success on the

---

[4] The EBF was created through various provisions of CBAs negotiated between the CSEA Plaintiffs and the State.  See Case No. 1:10-CV-00543 (Dkt. No. 9 Exs. F-I).  Those provisions require the State to deposit a specific sum of money into the EBF on specific dates, the funds to be used to provide CSEA members with dental, vision, prescription and other benefits.  The EBF is funded solely through the negotiated State payments.  The State has not made the scheduled payments as of April 1, 2010.  See Case No.1:10-CV-00543, Hanna Aff. (Dkt. No. 9-1); Howard Aff. (Dkt. No. 9-5).

[5] William Howard, Director of the EBF asserts that the resultant harm is compounded by the fact that "[i]f the EBF suspends benefits to State and UCS employees," it will need to make staff reductions and notify its providers, and so, "[e]ven if the EBF could resume full operations at some point in the future, . . . the EBF will have to re-establish not only its administrative staff and its network of providers, but its trustworthiness as a business."  Howard Aff. (Dkt. No. 9-5) ¶ 30.

13

merits" of its claim or raising "sufficiently serious questions going to the merits to make them a fair

ground for litigation coupled with a balance of hardships tipping decidedly in the movant's favor."

NXIVM Corp., 364 F.3d at 476.  Because Plaintiffs meet their burden under the more rigorous

likelihood of success on the merits showing, the Court will restrict its analysis to that standard.[6]

 Article I, § 10, cl. 1 of the United States Constitution provides, in relevant part: "No

State shall. . . . pass any . . . Law impairing the Obligation of Contracts . . . ."  While this language

appears absolute on its face, the reach of the Contract Clause is necessarily limited by the State's

sovereign power to protect the health, safety, and welfare of its citizens.  See Allied Structural Steel

Co. v. Spannus, 438 U.S. 234, 241 (1978).  The extent to which the Clause limits State power is

determined by a three-part test which questions, "(1) whether the contractual impairment is in fact

substantial; if so, (2) whether the law serves a significant public purpose, such as remedying a

general social or economic problem; and, if such a public purpose is demonstrated, (3) whether the

means chosen to accomplish this purpose are reasonable and appropriate."  Sanitation and Recycling

Indus., Inc. v. City of New York, 107 F.3d 985, 993 (2d Cir. 1997) (citing Energy Reserves Group,

---

[6] The Court makes no finding as to whether its restricted analysis is required by either the nature of the challenged action, see Plaza Health Labs., Inc. v. Perales, 878 F.2d 577, 580 (2d Cir. 1989) ("where the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme . . . the moving party [must] establish[] . . . a likelihood that he will succeed on the merits of his claim"), but see Haley, 883 F. Supp. at 822 ("the alleged failure of the Governor to make appropriations for the payment of wages to legislative workers . . . can hardly be classified as part of a statutory or regulatory scheme, and has, at best, attenuated and dubious connections to the public interest"), or the nature of the relief sought, see Jolly v. Coughlin, 76 F.3d 468, 473-74 (2d Cir. 1996) (where a party seeks a mandatory, rather than prohibitory injunction that party must show a "clear," "substantial," or "strong" likelihood of success on the merits.); see also Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 114 (2d Cir. 2006); Haley, 883 F. Supp. at 822 (finding that where "plaintiffs seek a court order essentially commanding the Governor to appropriate funds for the payment of their wages until such time as a final decision on the merits is reached" the relief sought is a mandatory injunction).

Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411-13 (1983); Allied Structural Steel, 438 U.S. at 242-44; United States Trust Co. of New York v. New Jersey, 431 U.S. 1, 22-23 (1977)).

> i.   *Substantial Contractual Impairment*

Under the above analysis, this Court must first determine "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." Allied Structural Steel, 438 U.S. at 244. "Total destruction" or repudiation of the contract is not necessary for an impairment to be substantial. United States Trust Co., 431 U.S. at 26-27. Rather, this Circuit has stated that "the primary consideration in determining whether the impairment is substantial is the extent to which reasonable expectations under the contract have been disrupted." Sanitation and Recycling Indus., 107 F.3d at 993  (citing Energy Reserves, 459 U.S. at 411).  This approach is consistent with the Supreme Court's statement that "the severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the Framers placed on the protection of private contracts.  Contracts enable individuals to order their personal and business affairs . . . .  Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them." Spannaus, 438 U.S. at 245.  Thus, impairments that go to the heart of the contract, that affect terms upon which the parties have reasonably relied, or that significantly alter the duties of the parties under the contract are substantial.  Id.; Surrogates I, 940 F.2d at 772.

In Buffalo Teachers Federation v. Tobe, the Second Circuit found that in an employment contract, the promise to pay a certain sum of money is the "most important element[] of a contract," and "the central provision upon which it can be said [the employees] reasonably rely."  464 F.3d 362, 368 (2d Cir. 2006).  Thus, the court held that a wage freeze, which relieved the City of Buffalo of its previously existing contractual obligation to pay a 2% raise, was a substantial impairment of

the contract.  Id.; see also Surrogates I, 940 F.2d at 772 (court held that a lag payroll scheme, which

withheld 10% of earnings over twenty weeks was a substantial impairment); Assoc. of Surrogates v.

New York, 79 N.Y.2d 39 (1992) (lag payroll resulting in 10% reduction in salary over 10 weeks "is

not an insubstantial impairment to one confronted with monthly debt payments and daily expenses

for food and the other necessities of life"); Condell v. Bress, 983 F.2d 415, 419 (2d Cir. 1993) (lag

payroll resulting in payment of nine days' salary instead of ten days' salary over five pay periods is a

substantial impairment);  Subway-Surface Supervisors v. NYC Transit Auth., 44 N.Y.2d 101 (1978)

(one-year wage freeze found to be a substantial impairment); Baltimore Teachers Union v. Mayor

and Council of Baltimore, 6 F.3d 1012, 1012, 1018 (4th Cir. 1993) (finding substantial impairment

where a .95% annual salary reduction was implemented to meet budgetary shortfall).

   The furlough provisions of the extender bills submitted by Governor Patterson and adopted

by the New York State Legislature result in a 20% pay reduction for affected workers; the extender

bill also specifically excludes for certain workers the raises previously negotiated through collective

bargaining.  While the furlough program is promised to be of a limited duration, see Case No. 1:10-

CV-00543, Megna Aff. (Dkt. No. 18) ¶ 97, no reimbursement of lost wages during the furloughs is

planned.  Retroactive reimbursement of unpaid increased wages is promised once the 2010-2011

budget is in place.  Id. ¶ 86.

   Defendants argue that because the withholding of the 4% salary increase is temporary and to

later be reimbursed, the impairment is not substantial.  See, e.g., Case No. 1:10-CV-00543, Defs.'

Mem. (Dkt. No. 18-10) at 18.  These facts may lessen the severity of the impairment, but they in no

way make that impairment insubstantial.  Defendants' argument ignores that what is most

significant in determining the substantiality of an impairment is the extent to which the

16

disadvantaged party reasonably relied on the terms of the agreement and ordered its affairs based upon those terms. Spannaus, 438 U.S. at 246. Here, full-time employment as well as the contracted-for increases of workers' salaries, which the State now seeks to reduce and delay, are fundamental aspects of the collective bargaining agreements, which Plaintiffs bargained for and upon which they reasonably relied. Moreover, the impairments resulting from the extender bill are equal to or greater than those deemed substantial in the line of cases cited above. The Court, therefore, concludes that the challenged provisions of the extender bill constitute substantial contractual impairments.

ii.     *Legitimate Public Purpose*

Legislation which substantially impairs contractual rights runs afoul of the Contract Clause, and is impermissible, if a legitimate public purpose is not served by its enactment. See Buffalo Teachers, 464 F.3d at 368. "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." Energy Reserves, 459 U.S. at 412. To demonstrate such a legitimate purpose, the legislation "should be aimed at remedying an important 'general social or economic problem.'" Sanitation & Recycling Indus., 107 F.3d at  993 (quoting Energy Reserves, 459 U.S. at 412). The purpose of the legislation cannot "be simply the financial benefit of the sovereign," Buffalo Teachers, 464 F.3d at 368, or "for the mere advantage of particular individuals." Home Bldg. & Loan Assoc. v. Blaisdell, 290 U.S. 398, 449 (1934).  Thus, the Court turns to the question of the whether the challenged portions of the extender bills meet this requirement.

Defendants attest at great length to the severity of the fiscal crisis faced by New York State, describing circumstances in which limited or insufficient funds are available to meet expected

expenditure obligations.  See, e.g., Case No. 1:10-CV-00543 Defs.' Mem. (Dkt. No. 18-10) at 6-8;

see generally Megna Affs. (Dkt. Nos. 18; 26).  The State faces a significant revenue shortfall, and in

the absence of an enacted budget for the 2010-11 fiscal year, Defendants contend that the Governor

advanced the weekly extender bills to the Legislature in order to address the fiscal crisis on a short-

term basis.  Case No. 1:10-CV-00543 Defs.' Mem. (Dkt. No. 18-10) at 19-20.  That the State's

current financial situation is as precarious as Defendants assert is not doubted by the Court.  Yet the

public purpose inquiry as to the challenged provisions is not immediately resolved by reference to

the State's budgetary problems.

Broadly speaking, a state government's interest in addressing a fiscal emergency constitutes

a legitimate public interest.  See Buffalo Teachers, 464 F.3d at 369.  Plaintiffs' submissions,

however, raise some doubt as to what extent that legitimate public purpose is directly present in

these cases.  See, e.g., Case No. 1:10-CV-00543 (Dkt. No. 9-11) at 16-20; Case No. 1:10-CV-00544

(Dkt. No. 4-8) at 5-6, Case No. 1:10-CV-00546 (Dkt. No. 4-15) at 4, 9-15; Case No. 1:10-CV-

00544, Legislative Resolution (Dkt. No. 4-7 Ex. L); Case No. 1:10-CV-00549 (Dkt. No. 4-15) at 8-

10.  In short, the Court observes that because the State lacks an enacted budget, the continued

operation of state government and its services continually rests upon the Legislature's authorization

of the weekly extender bills proposed by the Governor.  Thus, the bills, which are sent to the

Legislature on a take-it-or-leave-it basis for purposes of enacting the provisions, entail the

legislative choice between allowing the government to shut down or approving the extender bill in

its entirety.  As a result, the Legislature may approve an extender bill in order to avoid a shutdown,

even when the contents of the bill are viewed very unfavorably.  See, e.g., Case No. 1:10-CV-

00544, Legislative Resolution (Dkt. No. 4-7 Ex. L) ("WHEREAS, In order to avoid a shutdown of

all the state's essential services, the Legislature has little choice but to vote for the provisions of the emergency appropriation bill, notwithstanding its objection to the furlough provision of the bill . . .").

In the present circumstances, the Governor's assertion of a legitimate public purpose for the challenged provisions in the bill differs dramatically from the expressed view of the Senate, which denies the legitimacy of the contractual impairments that the bill creates.  The record before the Court shows that the contested terms were abruptly placed within a weekly emergency appropriations bill by the Governor after communications with state employee unions did not lead to desired results; that is, the contractual impairments were the sudden and sole work of the Executive and were proposed in a manner that largely precluded legislative deliberation.  See, e.g.,  See Case No. 1:10-CV-00544, Megna Aff. (Dkt. No. 11) at 21-36; Pls.' Mem. (Dkt. No. 4) at 3.  While these facts do not necessarily negate the existence of a legitimate public purpose, it is quite clear they reveal something other than a facially legitimate government plan to address fiscal difficulties.

A state government's authority to substantially impair its contracts in furtherance of a legitimate public purpose rests on a stronger footing where that government has followed the ordinary course of its constitutional processes; where, that is, the Executive and Legislative bodies have, in their respective capacities, assessed what actions best serve the public good, and, more fundamentally, what that public good is.  In the context of an emergency appropriations bill, the Executive alone renders these decisions and asks the Legislature, not without a measure of structural coercion, to acquiesce to those same conclusions or cause the shutdown of state government.  An emergency extender bill, which by its own terms functions as a short-term fix while the state's budget is resolved, may thus not be conducive to a state government's identification of and response

to a legitimate public purpose.  Substantial contractual impairments made pursuant to such a bill, though purportedly taken in furtherance of a legitimate public purpose, may deserve a level of scrutiny that reflects the unusual circumstances and limited process by which the impairments were undertaken.  Cf. Haley, 883 F. Supp. at 822 (court noting the "attenuated and dubious connections to the public interest"of governor's action taken in the context of an emergency appropriations bill).  In the instant matter, the Court does not make an express finding that a legitimate public interest is absent in the Governor's inclusion of the challenged provisions.  The Court will assume for argument's sake that this requirement is met and shall analyze whether the means utilized by the government are reasonable and necessary.  See Buffalo Teachers, 464 F.3d at 369.

   iii.    *Reasonable and Necessary Means*

        To withstand challenge under the Contract Clause, legislation that substantially impairs contractual rights must employ means that are reasonable and necessary to meet the stated legitimate public purpose of the legislation.  Id.  The instant matter presents a case in which the State of New York is itself a party to the contracts underlying the Plaintiffs' challenge, a fact of consequence for this Court's review.  See United States Trust Co., 431 U.S. at 23, 29 ("deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake" and a "State cannot refuse to meet its legitimate financial obligations simply because it would prefer to spend the money to promote the public good rather than the private welfare of its creditors."); Energy Reserves, 459 U.S. at 412 n.14 ("When a State itself enters into a contract, it cannot simply walk away from its financial obligations.").  "Courts are less deferential to a state's judgment of reasonableness and necessity when a state's legislation is self-serving and impairs the obligations of its *own* contracts."  Condell, 983 F.2d at 418 (emphasis in original).  In Surrogates I,

940 F.2d 766, the Second Circuit, ruling that legislation imposing a lag payroll scheme impaired certain public employees' collective bargaining agreements, opined that: "The contract clause, if it is to mean anything, must prohibit New York from dishonoring its existing contractual obligations when other policy alternatives are available."

"To be reasonable and necessary under *less deference scrutiny*, it must be shown that the state did not (1) 'consider impairing the . . . contracts on par with other policy alternatives' or (2) 'impose a drastic impairment when an evident and more moderate course would serve its purpose equally well,' nor (3) act unreasonably 'in light of the surrounding circumstances.'" Buffalo Teachers, 464 F.3d at 371 (quoting United States Trust Co, 431 U.S. at 30-31) (emphasis in original).  It is quite clear that less deference scrutiny is appropriate here.  Accordingly, to the extent that Defendants argue that the Court should defer to a claimed legislative judgment that the challenged provisions are reasonable and necessary, this argument must be rejected.  Bearing in mind that a "law that works substantial impairment of contractual relations must be specifically tailored to meet the societal ill it is supposedly designed to ameliorate," Sanitation & Recycling Indus., 107 F.3d at 993, the Court must determine whether Defendants can demonstrate that they took none of the aforementioned actions in enacting the challenged terms of the extender bill, such that the terms are in fact reasonable and truly necessary.

The instant matter, in this Court's view, does not present a close case.  First, Defendants do not, and evidently cannot, direct the Court to any legislative consideration of policy alternatives to the challenged terms in the bill; rather, the only support offered by Defendants for their assertion that the contractual impairment was not considered on par with other alternatives is a list of assorted expenditure decisions made by the State over the past two years, such as hiring freezes and delays of

school aid. <u>See, e.g.</u>, Case No. 1:10-CV-00543, Defs'. Mem. (Dkt. No. 18-10) at 22.  This will not do.  That the State has made choices about funding and that a fiscal crisis remains today surely cannot, without much more, be sufficient justification for a drastic impairment of contracts to which the State is a party.  Without any showing of a substantial record of considered alternatives the reasonableness and necessity of the challenged provisions are cast in serious doubt.

Second, and relatedly, Defendants cannot demonstrate that they did not impose a drastic impairment when an evident and more moderate course was available.  Once again, their argument is limited to generalities (For example: "In order to alleviate the current fiscal and cash crisis, measures must be taken on all fronts - including reduction in workforce spending."  Id. at 26.) supported only by assertions that other measures would not produce savings equivalent to those created by the current provisions.  Thus, Defendants simply assume a benchmark of the amount of savings attributed to the provisions and conclude that alternatives suggested by Plaintiffs in their briefing would be deficient.  Yet it is not the Plaintiffs' burden to prove that particular alternatives would add up to the same savings, <u>United States Trust Co</u>, 431 U.S. at 29-31, and Defendants do not satisfactorily explain why a particular level of savings must be obtained from state personnel, aside from general reference to the fiscal crisis.  That is, while Defendants have identified a fiscal emergency and note that state personnel comprise a significant source of state spending, their argument equates the broad public purpose of addressing the fiscal crisis with retrieving a specific level of savings attributed to the provisions.  <u>See</u> Case No. 1:10-CV-00543, Megna Aff. (Dkt. No. 18) ¶¶ 21-36.  The two are not the same.  Where reasonable alternatives exist for addressing the fiscal needs of the State which do not impair contracts, action taken that does impair such contracts is not an appropriate use of State power.  In its submissions to the Court, the State artificially limits

the scope of alternatives for addressing the fiscal crisis to retrieving a certain amount of savings from unionized state employees.  According to this view, the reasonableness and necessity of the challenged provisions is demonstrated simply because there is a fiscal crisis and Plaintiffs have not identified alternative sources from their own contracts for the same level of funding as that desired by the State.  Plaintiffs are not charged with that responsibility.  The desired savings need not come from state personnel in the amount identified by the State.  Rather, the State must consider both alternatives that do not impair contracts as well as those which might do so, but effect lesser degrees of impairment.

Most importantly, the Court cannot ignore the conspicuous absence of a record showing that options were actually considered and compared, and that the conclusion was then reached that only the enacted provisions would suffice to fulfill a specified public purpose.  While the Court would afford significant deference to a legislative judgment on an issue of this type where the State is not a party to the impaired contract, the Court cannot do so here -- not only because the state is a contractual party but, far more critically, because actual legislative findings in support of the provision cannot be located; due to the take-it-or-leave nature of the extender bill, in conjunction with the Senate's contemporaneous and unanimous statement opposing the challenged provisions, there is no adequate basis before the Court on which it may be established that the provisions are reasonable and necessary.

Defendants' argument, once again, is limited to emphasizing the State's fiscal difficulties; Defendants fail to articulate why the particular provisions were selected, and they appear to expect the Court to accept that the measures are reasonable and necessary solely because of the State's fiscal difficulties.  Broad reference to an economic problem simply does not speak to the policy

23

consideration and tailoring that is required to pass scrutiny under Plaintiffs' Contract Clause

challenge.  Defendants cannot rest such a substantial impairment of its contracts on such a minute

basis.  With respect to this inquiry, it is, therefore, highly probable that Plaintiffs will prevail on the

merits.

 Third, the surrounding circumstances, far from providing justification for the provisions or

otherwise indicating their reasonableness, highlight why the challenged provisions face a minimal

likelihood of being found reasonable and necessary.  As the Court has adverted to already, the

weekly extender bills are not budgetary legislation in the normal course.  <u>See</u> Case No. 1:10-CV-

00543, Megna Aff. (Dkt. No. 18) at 28-30.  They represent emergency appropriation measures

occasioned by the lack of an enacted budget; due to the temporary, stop-gap function of the bills, the

Governor submits each one to the Legislature for enactment on a weekly basis.  In effect, the bills

do not permit deliberation beyond approval or rejection in their entirety, where the failure to enact a

bill for the subsequent week results in government shutdown.  Accordingly, the question of the

reasonableness and necessity of the provisions is buried within a precarious legislative choice, as a

vote for approval is a vote against shutdown.  The deficient legislative record which has

significantly inhibited Defendants from demonstrating to the Court the reasonableness and necessity

of the furloughs and wage freezes is an obvious consequence of this situation.  Thus Defendants fail

to show the requisite level of consideration and tailoring by the Executive and fail to demonstrate

the existence of a legislative judgment that the provisions are reasonable and necessary.  Further, it

should be noted, Defendants do not direct this Court to any case upholding a similar contractual

impairment of the severity present in the instant matter or a case upholding any substantial

impairment on the basis of such an exceptionally limited legislative process.[7]

_____

[7] Defendants specifically cite to three cases for the proposition that the provisions are reasonable: Buffalo Teachers Federation v. Tobe, 464 F.3d 362, 367 (2d Cir. 2006); Baltimore Teachers Union v. Mayor and City Council of Baltimore, 6 F.3d 1012, 1019 (4th Cir. 1993); Subway-Surface Supervisors Assn. v. New York City Tr. Auth., 44 N.Y.2d 101, 110 (1978).  None provide the support Defendants seek.  They present *cities*, which face very different revenue raising and budgeting capacities than a state, addressing circumstances where personnel costs make up a far greater percentage of budget expenditures than in the case of New York State, by implementing vastly more moderate measures supported by legislative findings.  Turning to the cases, first, the State was not directly a party to the impaired contract in Buffalo Teachers, and the Court found that the circumstances justified applying more deference to the legislative judgment of reasonableness and necessity.  Moreover, the impairment at issue was a temporary wage freeze, and the court observed that the measure was adopted after adequate legislative consideration of need and alternatives had occurred.  Thus, Buffalo Teachers stands in stark contrast to the instant cases in all essential respects.  The Fourth Circuit case of Baltimore Teachers Union is also uninstructive.  There, the city enacted a 2.5 day furlough plan which operated to reduce employees' salary by approximately 1%.  The court found that: "the State proposed an eleventh-hour, second round of cuts in state aid to the City, totaling approximately $ 13.3 million. Only then, and only in order to maintain its budget in balance and avoid further layoffs, did the City resort to the furlough plan at issue here. The City's obvious reluctance to resort to the plan and its decision to do so only when it concluded that it had no better alternative belies the 'political expediency' suspected in Surrogates [I] . . . . [and i]n short, the city clearly sought to tailor the plan as narrowly as possible to meet its unforeseen shortfalls." 6 F.3d  at 1020-21 (footnote and citations omitted).  Baltimore Teachers Union thus presents a substantially less severe impairment and circumstances which the Fourth Circuit found to demonstrate reasonableness and necessity; the indicia of reasonableness and necessity noted by that case are largely absent in the instant one.  Moreover, Baltimore Teachers Union is something of an outlier in Contract Clause jurisprudence, and the degree of scrutiny applied has been questioned and not replicated.  See Univ. of Hawai'i Prof'l Assembly, 183 F.3d at 1105 n.6 (citing dominant line of cases and noting, as an exceptional case, that  "[Baltimore Teachers Union] has been severely criticized.").  Lastly, Subway-Surface Supervisors is another instance in which a more mild impairment, a temporary prospective wage freeze, was upheld upon a stronger legislative record.  The New York State Court of Appeals found that the Legislature had made several determinations of need and tailored the impairment to meet the situation in light of the available options.  No such legislative record is before the Court in the present case to support the emergency appropriation bill's more damaging impairments.

To uphold self-interested impairments of contractual rights from suit under the Contract Clause, the Court must see that the impairments are reasonable and necessary, as established by real and demonstrable consideration of needs and alternatives. Instead, the Court observes both a complete repudiation by the Senate of such a judgment and an argument by Defendants that fails to show sufficient consideration and analysis of the kind required by the Contract Clause. In the Senate's resolution objecting to the challenged provisions and seeking an emergency appropriation bill without those portions, it is expressly stated, *inter alia*, that:

> The language in the bill requiring a one day furlough is contrary to the laws and public policy of this state . . . [and] This Legislative Body believes it is not reasonable or fiscally necessary to impose furloughs on unionized state employees . . . [and] There are other alternatives available that can address the fiscal challenges faced by the state . . . .

Case No. 1:10-CV-00544, Legislative Resolution (Dkt. No. 4-7 Ex. L). The Court cannot discount this articulation of legislative opinion, which succinctly denies the very elements essential to upholding the contractual impairments at issue. While the resolution may be non-binding, it is unanimous and nearly contemporaneous with the Senate's enactment of the extender bill containing the furloughs and wage freeze. As such, it strongly confirms what the Defendants' deficient record of consideration has already shown; namely, the challenged provisions are transparently unsupported by a basis of necessity and reasonableness.

In conclusion, the Court in no way suggests that the State cannot enact measures to address a fiscal crisis which may impair contracts to which the State is a party. The Contract Clause's "prohibition is not an absolute one and is not to be read with literal exactness like a mathematical

_____

formula." <u>Blaisdell</u>, 290 U.S. at 428.  The Court finds it substantially unlikely, however, that the challenged provisions currently before it will be upheld.  Defendants seek to base a tremendous impairment on little more than the fact of the State's fiscal difficulties.  In the absence of any showing of legislative consideration or tailoring, it is unreasonable to impose such an impairment through emergency appropriation bills, particularly when there is a unified legislative voice denying the very reasonableness and necessity of the enactment.  The Court, therefore, finds that the provisions cannot be enacted in this manner and on this record.  Plaintiffs have met their burden of showing irreparable harm and a substantial likelihood on the merits of their claim.  A preliminary inunction shall issue.

## IV.    CONCLUSION

Accordingly, it is hereby

**ORDERED**, that Plaintiffs' Motions for a Preliminary Injunction (Case Nos. 1:10-CV-00543 (Dkt. No. 9); 1:10-CV-00544 (Dkt. No. 4); 1:10-CV-00546 (Dkt. No. 4); and 1:10-CV-00549 (Dkt No 4); 1:10-CV-00569 (Dkt. No. 2)) are **GRANTED consistent with this Order**; and it is further

**ORDERED**, that each and every Defendant, pursuant to Federal Rule of Procedure 65, is enjoined from submitting, enacting, or implementing emergency appropriations bills containing the furlough and wage provisions challenged in these actions; and it is further

**ORDERED**, that the Clerk serve a copy of this Order on the parties.

**IT IS SO ORDERED**.

DATED:      May 28, 2010
            Albany, New York

Lawrence E. Kahn
U.S. District Judge